UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

VICKY LYN KNAPP,                  )
                                       )
        Plaintiff,             )
                                       )
    v.                         )     CIVIL NO.  1:16cv191
                                       )
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,   )
                                       )
        Defendant.        )

## OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB) and for Supplemental Security Income (SSI) as provided for in the Social Security Act.  42 U.S.C. §416(I).  Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act

through June 30, 2016.

2.     The claimant has not engaged in substantial gainful activity since June 29, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: Osteoarthritis of multiple joints, lumbar sacroiliitis, lumbar radiclitis, myositis/myalgia, lumbar spondylosis, history of breast cancer, obesity, hypertension, hammer toes and varicosities in the legs, major depressive disorder, history of diagnosis of adult attention deficit disorder, generalized anxiety disorder, panic disorder (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant is limited to lifting, carrying, pushing, and pulling 10 pounds frequently and occasionally. The claimant can sit at least 6 hours in an 8 hour workday and stand and/or walk 2 hours in an 8 hour workday. The claimant should not climb ladders, ropes, or scaffolds. The claimant cannot kneel, crouch, or crawl. The claimant can occasionally balance. The claimant can occasionally bend and stoop in addition to what is required to sit. The claimant can occasionally use ramps and stairs. Aside from the use of ramps and stairs on an occasional basis, the claimant should not work upon uneven surfaces. The claimant should avoid working upon wet and slippery surfaces. The claimant should avoid work within close proximity to open and exposed heights and open and dangerous machinery such as open flames and fast moving exposed blades. The claimant should avoid driving motor vehicles and heavy machinery. The claimant requires a cane for prolonged ambulation and when upon uneven surfaces. No kneeling, crouching, or crawling. The claimant is limited to work that involves only simple, routine, and repetitive tasks that can be learned through short demonstration and up to 30 days. The claimant can maintain the concentration required to perform simple tasks. The claimant can remember simple work-like procedures. The claimant can make simple work-related decisions. The claimant is limited to work within a low stress job defined as requiring only occasional decision making and only occasional changes in the work setting. The claimant can tolerate predictable changes in the work environment. The claimant can meet production requirements in an environment that allows her to sustain a flexible and goal oriented pace. The claimant is limited from fast-paced work such as assembly line production work with rigid or

strict productivity requirements.  She is limited to superficial interaction with coworkers, supervisors, and the public, with superficial interaction defined as occasional and casual contact not involving prolonged conversation.  Contact with supervisors still involves necessary instruction.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March 15, 1972, and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 29, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 1049- 1062)

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review.  This appeal followed.

Plaintiff  filed her opening brief on December 30, 2016.  On April 7, 2017, the defendant filed a memorandum in support of the Commissioner's decision, and on April 20, 2017,  Plaintiff filed her reply.  Upon full review of the record in this cause, this court is of the view that the

ALJ's decision should be affirmed.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

On July 20, 2012, Plaintiff filed applications for disability insurance benefits (DIB) and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1382c(a)(3), alleging disability beginning June 29, 2012 (Tr. 1047). After a hearing, an Administrative Law Judge (ALJ) issued a decision on September 27, 2013, in which she found that Plaintiff was not disabled (Tr. 27-38). Plaintiff appealed that decision and upon joint motion, this court entered an order remanding that decision (Tr. 1044). Upon remand and consolidation, a second ALJ found that Plaintiff was not disabled in a decision dated March 23, 2016 (Tr. 1044-77). The Appeals Council denied Plaintiff's request for review of this

decision, rendering it the Agency's final decision for purposes of judicial review.

The following facts are relevant to the instant appeal. In October 2007, Plaintiff underwent a partial mastectomy of her left breast (Tr. 340-41, 370, 645-49). Three months later, she complained of dizziness when arising from the seated position and frequent urination (Tr. 342). She had reportedly undergone three rounds of chemotherapy and had tolerated it fairly well after experiencing some initial diarrhea (Tr. 342, 518-22, 636-44). Dr. Shawn Kidder, Plaintiff's primary care doctor, reduced the dosage of her Benicar (prescribed for high blood pressure), which he thought was causing her complaints of dizziness, and indicated he would wait to see if her urine complaints resolved on their own (Tr. 343). He also continued her on Fluoxetine (Prozac), which she had been prescribed since at least November 2006 (Tr. 343, 356, 373-75). In February 2008, Dr. Gary Gize, Plaintiff's oncologist, wrote a letter in which he reported that Plaintiff had been undergoing chemotherapy since November 2007, which caused significant fatigue, nausea, vomiting, neuropathy, and joint pain, and that he deemed her unable to work during this time (Tr. 639). By April and May 2008, Plaintiff reported to Dr. Gize that she was doing well. (Tr. 532-36). In June 2008, Dr. Scott Armstrong, a primary care doctor, and Dr. Gize treated Plaintiff for dryness and sores on her feet that were apparently unrelated to chemotherapy (Tr. 593-94, 631).

In July 2008, there was recurrent cancer in Plaintiff's left breast, and she underwent a double mastectomy, due to family history and difficulty in diagnosing the second lesion (Tr. 402, 481-92, 549-52, 555). She developed an infection in the site, but was pain-free in August 2008, and began undergoing procedures for reconstructive surgery (Tr. 538-49, 564-65). In subsequent visits with Dr. Gize, she was doing "quite well" with sufficient energy (Tr. 621-29).

6

In November 2008, Plaintiff was reportedly undergoing chemotherapy (Tr. 404). That same month, Dr. Armstrong treated Plaintiff for a painful varicose vein in her left leg and pain and swelling in her legs, worse with walking and standing for a long time (Tr. 599-600). He instructed Plaintiff to wear TED hose as needed (Tr. 600). Plaintiff also underwent chemotherapy in January 2009, which she completed in February (Tr. 505-16, 523).

In January 2009, Plaintiff saw psychologist Dr. Rosalind Huang for a consultative exam (Tr. 499). Plaintiff complained that she got anxious easily at night, for which she took Ativan, and felt depressed with little motivation or energy (Tr. 499-500). She had one good friend. (Tr. 500). She took a shower twice a week and lived with a friend, who cooked, did laundry, and shopped for groceries (Tr. 501). Dr. Huang observed that Plaintiff had weak memory (Tr. 499). She could not recall what she had for breakfast the previous day, but she repeated five digits forward and three digits backward and stated the names of the last two presidents (Tr. 499). She had fair concentration and normal speech (Tr. 499). Dr. Huang diagnosed Plaintiff with major depressive disorder, severe, and anxiety disorder NOS, and assigned a GAF score of 50 (Tr. 502).

In March 2009, Plaintiff complained to Dr. Gize of aphasia (difficulty finding the right words to say) and decreased energy (Tr. 620). A brain MRI was normal (Tr. 659).

In March 2009, Plaintiff saw Dr. Holton for a consultative physical exam (Tr. 523). Plaintiff reported shortness of breath but apparently had only a mildly abnormal pulmonary function test (Tr. 523, 528-34). She also reported fatigue with walking and indicated that she had been treated for hypertension for several years (Tr. 523). She could sit two hours and stand one hour without significantly increased discomfort, and her oncologist told her not to lift more than eight or ten pounds (Tr. 523). She independently performed self-care (Tr. 523).

Upon exam, Plaintiff had some 1+ (slight) pitting ankle edema (swelling); diminished deep tendon reflexes; some slightly reduced ranges of motion; moderate generalized stiffness, but no obvious joint deformities; and some fatigability and mild shortness of breath with exertion, but it "resolve[d] readily" (Tr. 524). She had an otherwise normal exam, including cardiovascular (Tr. 523-26). Dr. Holton diagnosed Plaintiff with breast cancer, status post reconstruction/chemotherapy; exertional shortness of breath of unknown cause; hypertension; depression with anxiety by report; and lower extremity varicosities and edema (Tr. 525).

In April 2009, Plaintiff underwent reconstructive right breast surgery with Dr. Geoffrey Randolph (Tr. 537). That same month, Dr. Armstrong strongly urged Plaintiff to quit smoking and prescribed Chantix (Tr. 606-07). In mid-June 2009, she underwent a procedure for permanent implants (Tr. 536, 560-62). In early July, Dr. Randolph indicated that she could resume her normal activities in two to three weeks (Tr. 535). In August 2009, Dr. Gize saw her for follow-up. She had a normal exam, but complained of abdominal pain (Tr. 619).

Right knee x-rays taken in August 2009 revealed mild to moderate osteoarthritis with trace effusion (fluid) and no fracture (Tr. 426). Dr. Armstrong recommended knee strengthening exercises and administered an injection the following month (Tr. 589-90, 615).

In March and December 2010, Plaintiff reported to Dr. Gize that she was doing quite well, and she had no clinical evidence of disease (Tr. 872-73). In December 2010, Dr. Kidder switched Plaintiff from Effexor to Prozac at her request (Tr. 890-91). She was doing well and had no complaints, but wished to go off Effexor due to cost (Tr. 890-91).

In March 2011, Plaintiff saw Dr. Kidder for medication refills and she had a normal exam, including a normal mental status and neurological exam (Tr. 888-89). She denied

anxiety, depression, heart or lung problems, or urinary incontinence or urgency (Tr. 888).

In late June and early July 2012, Plaintiff was treated for complaints of chest pain into her left shoulder and dizziness at an E/R and by Dr. Kidder (Tr. 791-802, 824-33). She had a normal treadmill exam, EKG, chest x-rays, blood tests, and physical and mental status exams (Tr. 791-92, 816, 825-33, 842). She was continued on aspirin and Prozac; prescribed Ibuprofen for the pain; and advised to monitor her low blood pressure (Tr. 791-92). In July 2012, Plaintiff complained of pain in her right leg and hip, left shoulder, back, and neck (Tr. 822-23). She had a normal exam, and Dr. Kidder added Neurontin (commonly prescribed for nerve pain) to her medications, which included Prozac (Tr. 822). The following month, Plaintiff reported that bladder medication and Ativan were helping, but she thought the dosage of Neurontin was too high; Dr. Kidder decreased the dosage (Tr. 862-63). She had a normal exam, including mental and neurological findings, and no edema (Tr. 863).

In August 2012, consulting psychologist Dr. Dan Boen examined Plaintiff (Tr. 846). Plaintiff reported feeling depressed, having trouble focusing, having up to four panic attacks a week, experiencing nervousness in social situations, and feeling angry and irritable (Tr. 846). She reported dressing every day and bathing every other day, but had trouble with it due to arthritis or lack of initiative, especially when she was going through her prior chemotherapy (Tr. 846). She reportedly cooked short meals daily; did laundry with her children's help; tried to clean something daily; and went shopping at odd times to avoid too many people (Tr. 847). She played computer games; watched movies; recently started reading; and tried to go camping every other weekend with her partner and children (Tr. 847). She reported getting along with people "pretty well" and saw neighbors and family (Tr. 847). She had one friend whom she tried to

call once a month and saw her in-laws weekly (Tr. 847). Plaintiff reported taking Prozac for the last 20 years and usually it helped (Tr. 847). She also took Ativan (Tr. 847).

Dr. Boen concluded that Plaintiff's concentration was significantly deficient; immediate recall was moderately deficient; short and long-term memories were mildly deficient; and thought form, mood, affect, intelligence, judgment, and insight were all normal (Tr. 849). He diagnosed generalized anxiety disorder; panic disorder without agoraphobia; and recurrent major depressive disorder, moderate, and he assigned her a GAF score of 45 (Tr. 45). He opined that she could understand what she was asked to do, but would have trouble remembering it; could not concentrate and stay on task; and could get along with her coworkers and boss (Tr. 850).

That same month, state reviewing psychologist Dr. Pressner opined that Plaintiff had moderate limitations in activities of daily living and concentration, persistence, or pace and mild in social functioning (Tr. 89). For RFC, he opined that Plaintiff could complete unskilled work-like tasks and social functioning on a sustained basis (Tr. 92-94). He indicated that she would likely benefit from avoiding high-stress situations and avoiding working in crowded environments (Tr. 94). Three months later, Dr. Gange affirmed (Tr. 117, 121-22).

In September 2012, Plaintiff saw consulting physician Dr. David Ringel (Tr. 851-54). Plaintiff reported that she had been doing well since her mastectomy and chemotherapy (Tr. 851). She complained of body aches, occasional chest pain, numbness in her hands and feet, arthritis in her right knee with a brace, degenerative disc disease in her back, and a fibromyalgia diagnosis (Tr. 851). She could dress herself, but it took a little extra time; stand one hour at a time for a total of four hours; walk three blocks; sit for 20 minutes at a time; lift 12 pounds; and drive short distances (Tr. 851). She could perform all household chores as long as she took her

time (Tr. 851). She avoided stairs and did not do dishes or mow the lawn (Tr. 851).

Dr. Ringel observed that Plaintiff walked with a slight limp, but with no assistive device; was slow getting out of her chair; had spasms in her lower back; had some decreased range of motion in her neck, lower back, and hips; and could not perform a squat, but did not have a sufficient number of tender points to satisfy a fibromyalgia diagnosis; had a normal neurological exam, grip strength, and fine finger manipulation; and could get up on her heels, lay straight back, and get on and off the exam table without difficulty (Tr. 853).

That same month, state agency reviewing physician Dr. Brill opined that Plaintiff could lift or carry 10 pounds frequently and 20 pounds occasionally; sit for six hours total; stand/walk for two hours total; never climb ladders, ropes, or scaffolding, kneel, crouch, or crawl; and occasionally climb ramps and stairs, stoop, and balance (Tr. 103-04). He opined that she had limited reaching due to a double mastectomy and should avoid concentrated exposure to wetness and hazards (Tr. 104-05). Two months later, Dr. Sands affirmed the opinion (Tr. 118-21).

In February 2013, Plaintiff saw Dr. Kidder and reported side effects from Ditropan, prescribed for an overactive bladder. Dr. Kidder replaced it with Detrol (Tr. 883-86). She had no other complaints and specifically reported no anxiety; depression; incontinence; dysuria (painful urination); urinary frequency; or heart, lung, or neurological problems (Tr. 885-86).

On April 25, 2013, Dr. Kidder changed Plaintiff's blood pressure medication after she reported palpitations (Tr. 906). Her ADD was better with Adderall, and Dr. Kidder continued it (Tr. 906). That same day, Dr. Kidder wrote a letter to Medicaid services, in which he reported that presently, Plaintiff was suffering from breast cancer, hypertension, neuropathy, adult ADD, depression, overactive bladder, back pain, anxiety and varicose veins (Tr. 904). He opined that

she could not work from the combined effects of her impairments, which would not improve in the next two years (Tr. 904). He wrote an identical letter six months later (Tr. 1575).

In May 2013, Plaintiff went to Northeastern Center for a mental health evaluation because she planned to file for SSI that fall (Tr. 997-98). Plaintiff complained of depression and that her anti-depressant dosage was so high that she felt "nothing at all" (Tr. 997). She indicated that she also felt isolated socially and avoided crowds because they increased her anxiety (Tr. 997). She indicated that she took Adderall for what she called "chemo brain" or short-term memory loss (Tr. 997). Adderall reportedly helped a little, but she still had to write important things down (Tr. 997). Her initial diagnoses were moderate, recurrent major depressive disorder and generalized anxiety disorder with a GAF score of 45 (Tr. 997). Her initial treatment plan included individual counseling and medication management, but no mental health treatment "due to denial of need" (Tr. 997).

In May 2013, Plaintiff saw Barb Starry, N.P., at Ortho Northeast for follow-up of back and dorsal pain (Tr. 897). She was prescribed Mobic (anti-inflammatory) and referred to physical therapy (Tr. 898). The following month, she was discharged from therapy because she was feeling better and would be independent in performing home exercises (Tr. 912).

In June 2013, podiatrist Gage Caudell diagnosed Plaintiff with hallux valgus, left greater than right foot (deviation of the big toe, a.k.a. hammer toe) and pes cavus (high arches), right greater than left, and recommended lace-up ankle braces "for now" and accommodative shoes for bunions (Tr. 908). That same month, Dr. Jason Hanna of Fort Wayne Orthopedics saw Plaintiff for her complaints of hip and ankle pain (Tr. 929-36). Upon exam, Plaintiff had a mildly antalgic gait with no assistive device; pain with some ranges of motion in her right hip,

but not others; no pain and normal range of motion and stability in her left hip; and negative straight leg raising in both legs (Tr. 929). Hip x-rays showed moderate osteoarthritis, mild spurring, and good alignment (Tr. 930). He administered a steroid injection in Plaintiff's right hip and gave her home exercises (Tr. 931). Ankle x-rays showed moderate, diffuse degenerative changes in her right ankle and mild in her left (Tr. 936). He prescribed a Medrol Dosepak and braces for her ankles and withheld her Mobic until she finished her Dosepak (Tr. 936).

The following month, Plaintiff was treated by Dr. Jeffrey Barr at Ortho Northeast for her complaints of swelling and numbness in her hips (Tr. 923). He continued her on Mobic and ordered a lumbar MRI (Tr. 923). Studies performed that same month showed normal ejection fractions and no evidence of ischemia (insufficient supply of blood) in her heart (Tr. 943).

In July 2013, Plaintiff saw Nurse Practitioner Amy Scheeringa at Northeastern Center (Tr. 991-993). Plaintiff complained that Prozac was no longer effective and that she was isolated socially and avoided crowds because they increased her anxiety (Tr. 991). Plaintiff reported that her symptoms had increased in the previous nine months (Tr. 991). Ms. Scheeringa indicated that Plaintiff was able to describe symptoms that would fit a panic attack (Tr. 991). Plaintiff complained that Ativan, which she previously took, was more effective in controlling anxiety than Xanax (Tr. 991). She indicated that she took Adderall for what she called "chemo brain" that affects her attention and focus (Tr. 991). Adderall was reportedly very beneficial, but for unstated reasons, Plaintiff took only half the prescribed dose (Tr. 991). Plaintiff described her mood and affect as depressed and nervous (Tr. 992).

Ms. Scheeringa observed that Plaintiff showed forgetfulness at times, but otherwise had a

normal mental status exam (Tr. 992). She diagnosed Plaintiff with recurrent, moderate major depressive disorder and panic disorder with agoraphobia, and assigned her a GAF of 47 (Tr. 993). She continued Plaintiff on Adderall, but replaced Xanax with Ativan and Prozac with Cymbalta (Tr. 993). Later that month, Plaintiff reported that Adderall helped, but she still had to write things down, and she noticed changes in her anxiety with Ativan (Tr. 994). Her treatment plan included coping skills and relaxation techniques, group discussion, counseling, and medication management, but no mental health treatment "due to denial of need" (Tr. 994).

In October and November 2013, Plaintiff saw Dr. Kidder for pain from her hammer toes and diverticulitis (Tr. 1543-49). Lab tests showed ulcerative colitis (Tr. 1550). Plaintiff also asked to have Dr. Kidder prescribe something in place of Detrol, commonly prescribed for overactive bladder, because Medicaid would not cover it (Tr. 1550). He prescribed Vesicare in its place, prescribed Klonopin for insomnia, and continued her on Adderall (Tr. 1550-51). Three months later, Plaintiff saw Dr. Kidder for foot cellulitis and IBS (Tr. 1558-63).

In January 2014, Tracy Taraschke completed a status report, in which she indicated that Plaintiff's diagnoses were recurrent major depression and panic disorder with agoraphobia, with a GAF of 47 and unknown duration (Tr. 1535-40). Other than serial subtraction difficulty, Plaintiff's mental status exam results were largely normal (Tr. 1536-38).

In June 2014, Plaintiff had a lumbar medial branch block (Tr. 1580). The following month, Plaintiff reported significant improvement in functioning and daily activities, and Dr. Barr refilled her medications (Tr. 1580). She denied depression and urinary retention and weakness problems (Tr. 1580). The following month, she saw Dr. Kidder for ongoing arthritis concerns (Tr. 1568-73). She had a normal exam (Tr. 1572).

In August 2014, Plaintiff underwent a lumbar radiofrequency ablation for her complaints of burning lower back pain (Tr. 1576). One month later, Plaintiff complained that she still had burning, aching lower back pain, which she rated a 6 out of 10 (Tr. 1576). She denied depression and urinary retention and weakness problems (Tr. 1576). Dr. Barr observed that she had an antalgic gait and limited lumbar range of motion, but an otherwise normal exam (Tr. 1577). He refilled her Neurontin, Percocet (narcotic pain medication) and Zanaflex (muscle relaxant) and advised her to continue daily home exercises (Tr. 1576).

In September 2014, Plaintiff saw Dr. Kidder for medication refills (Tr. 1685-91). She reported chronic back pain, but no problems with incontinence or depression/anxiety (Tr. 1685). She had a normal exam and Dr. Kidder prescribed Geodon (for mood and sleep) and Pristiq (anti-depressant) (Tr. 1685-90). The following month, Dr. Kidder replaced her Klonopin with Xanax at her request (Tr. 1693). She had a normal exam, including mental status (Tr. 1693).

In October 2014, Plaintiff saw Dr. Boen for a second evaluation (Tr. 1583-85). She complained of depression, trouble concentrating, shakiness in social situations, and weekly panic attacks (Tr. 1583). She reported that she normally bathed and dressed daily (Tr. 1584). She cooked daily; did laundry twice weekly; went to the store weekly at times when fewer people are shopping; went on Facebook; played computer games; and enjoyed photography (Tr. 1584). She lived with her partner and two sons; saw the rest of her family weekly; had one friend she saw every few months; and got along with neighbors (Tr. 1584). Dr. Boen observed that Plaintiff's concentration and short-term memory were moderately below normal; that her immediate recall was mildly below normal; and that her long-term memory, intelligence, mood, affect, thought form, speech, consciousness, judgment, and insight were normal (Tr. 1585). He

opined that Plaintiff would have trouble remembering what she was asked to do on the job and would have difficulty concentrating and staying on task, but could understand what she was asked to do and get along with coworkers and a boss (Tr. 1585).

In October 2014, state agency reviewing physician Dr. J. V. Corcoran opined that Plaintiff could occasionally lift or carry 10 pounds and frequently lift or carry fewer than 10 pounds; sit for six hours total; stand or walk for two hours total; and occasionally perform postural movements, and should avoid concentrated exposure to hazards (Tr. 1175-77, 1180). Three months later, Dr. Eskonen affirmed the opinion (Tr. 1187-89, 1192).

In October 2014, reviewing psychologist Dr. Horton opined that Plaintiff did not have a severe mental impairment, and three months later, Dr. Gange affirmed (Tr. 1173-74, 1185-86).

The following month, Dr. Kidder prescribed a new anti-depressant (Fetzima) and resumed Klonopin in place of Xanax, due to Plaintiff's complaints of sleep disturbance and dysphoric mood (Tr. 1696-97). He continued Adderall at the same dose (Tr. 1696). Two weeks later, she reported that the new medications were working well (Tr. 1699). She had a normal exam, including mental status (Tr. 1699).

In January 2015, Plaintiff saw Nurse Practitioner Candace Lemke for intake psychiatric medication management at Bowen Center (Tr. 1833). Plaintiff complained of depression and isolating herself, difficulty sleeping, and occasional anxiety (Tr. 1828). Ms. Lemke observed that Plaintiff had a tearful mood, adequate concentration, average intellect, normal memory testing, and good insight and judgment (Tr. 1830-31). She diagnosed Plaintiff with severe, recurrent major depressive disorder and generalized anxiety disorder, and assigned her a GAF score of 50 (Tr. 1831-32). She indicated that Plaintiff would start individual therapy and added

Wellbutrin to her Fetzima, Adderall, and Klonopin (Tr. 1832). The following month, Plaintiff

had an intake counseling evaluation at Bowen Center (Tr. 1823). Plaintiff complained of

depression, anxiety, financial stressors, and sleep difficulty, but no panic attacks (Tr. 1823).

She reported that chronic pain was difficult and a source of depression and worry (Tr. 1826).

She wanted to return to work or qualify for disability if she was unable to work (Tr. 1826).

Counselor Renay Montgomery indicated that Plaintiff would learn to manage depression and

anxiety, and she referred Plaintiff to a vocational rehabilitation service (Tr. 1827). In

counseling from February through June, Plaintiff reported stress primarily due to finances and

health, but over time, largely reported decreased depression and frustration (Tr. 1838-50).

   In March 2015, Plaintiff saw Dr. Kidder for diverticulitis pain (Tr. 1702). She reported

no urinary or psychological symptom and had a normal exam (Tr. 1702). Later that month,

Plaintiff went to the E/R with a blood clot and pain in her right leg (Tr. 1711). She had a

Lovenox (used to prevent deep vein thrombosis – DVT) injection and one dose of Coumadin

(blood thinner) and took Percocet for leg pain (Tr. 1711). Report of symptoms indicated that

she was positive for myalgias, but reported no other complaints (Tr. 1711). She had a normal

exam (Tr. 1715). Dr. Kidder diagnosed DVT and continued her medications (Tr. 1716).

The following month, Plaintiff saw Dr. Kidder for depression medication check, at which

time she complained of right leg pain that came and went (Tr. 1710). The pain had improved on

Lovenox, which was recently discontinued (Tr. 1710). Her right leg was tender and swollen,

but she otherwise had a normal exam, including mental (Tr. 1722). An ultrasound showed that

Plaintiff's DVT was resolved (Tr. 179). In June, she had a normal exam (Tr. 1733).

   In September 2015, Plaintiff saw Drs. Barr and Harris at Ortho Northeast with complaints

of constant right hip pain and intermittent numbness/tingling in her right foot (Tr. 1755, 1761).

She was independent in activities, and she reported that Percocet benefitted her and injections

and exercises previously gave her some relief (Tr. 1755, 1761). She was considering hip

replacement surgery (Tr. 1756). She had an antalgic gait and reduced range of right hip motion

with no signs of DVT (Tr. 1756, 1762 ). X-rays showed loss of joint space and bone spurs, and

Dr. Harris diagnosed degenerative arthritis (Tr. 1756). In November, Plaintiff complained of a

right foot injury and swelling she incurred while gardening (Tr. 1738). She had no other

complaints (Tr. 1738). Upon exam, she had pain and edema in some toes (Tr. 1743). An x-ray

showed small bone spurs and mild osteoarthritic changes in one joint (Tr. 1788).

In support of remand, Plaintiff raises three broad arguments: (1) that the ALJ did not

properly consider several medical opinions; (2) that the ALJ did not consider Plaintiff's

impairments in combination; and (3) that the ALJ made a flawed credibility finding.

Plaintiff argues that the ALJ improperly rejected the opinions of Dr. Boen, a consulting

psychologist, and Dr. Kidder, her primary care doctor (Brf. at 9-10). Plaintiff also suggests that

the ALJ overlooked several "opinions" that were not RFC opinions, but were Plaintiff's own

subjective reports of symptoms that she made to medical providers several years before her

alleged disability onset date.

The record clearly shows that the ALJ properly weighed Dr. Boen's opinions and gave

good reasons for finding that his opinions regarding Plaintiff's ability to concentrate and stay on

tasks were not supported by and inconsistent with the record as a whole (Tr. 1060-61). As a

preliminary matter, the Appeals Council issued an order remanding the first ALJ's decision and

that order, among other things, directed the ALJ to consider Dr. Boen's opinion that Plaintiff

could understand what she was asked to do on a job, but would have trouble remembering it; would not be able to concentrate  and stay on task; and would be able to get along with coworkers and a boss (Tr. 1196). The order further directed the ALJ to re-evaluate the record medical opinions, including Dr. Boen's opinion, and provided adequate rationale for accepting or rejecting them (Tr. 1197).

Plaintiff argues that the ALJ erred because he allegedly did not follow the Appeals Council's order remanding the first ALJ's decision (Brf. at 9). However, this point cannot be considered, as it is beyond the scope of judicial review. See 42 U.S.C. § 405(g). Indeed, "[t]he question whether the ALJ complied with the Appeals Council's remand order is not, in the final analysis, of independent importance." *Poyck v. Astrue*, 414 Fed. Appx. 859, 861 (7th Cir. 2011). Rather, the "only question properly before [the Court] is whether the ALJ's decision (which the Appeals Council chose to leave undisturbed) is supported by substantial evidence." *See Poyck*, 414 F. App'x at 861 (citations omitted). Thus, an ALJ who addresses a remand topic, but does not allegedly cite substantial evidence to support his decision, does not violate an Agency order. Rather, he simply "commits an independent error that is reviewed like any other issue in the five-step evaluation process that governs disability cases." *See Teschner v. Colvin*, No. 15-CV-6634, *9 (N.D. Ill. Dec. 6, 2016). In any event, in the case at bar, the ALJ committed no reversible error, as he properly weighed Dr. Boen's opinions (Tr. 1053-55, 1060-61).

Plaintiff argues that the ALJ did not account for Dr. Boen's opinions as to her memory and concentration, but this argument ignores that the ALJ gave sufficient reasons for discounting Dr. Boen's opinions (Brf. at 9; Tr. 1060-61). Plaintiff further argues that "by setting aside the opinion of its own psych CE, Dr. Boen, the ALJ opinion has already committed error" (Brf. at

10). But the ALJ committed no error in rejecting Dr. Boen's opinion as to Plaintiff's concentration and ability to stay on task, as he provided good reasons for doing so (Tr. 1060-61).

The opinions of an examining physician, such as Dr. Boen, are reviewed for supportability and consistency with the other substantial evidence of record. See 20 C.F.R. § 404.1527(e); SSR 96-2p. At Step Three, the ALJ considered Dr. Boen's opinions, but at the same time noted Plaintiff's reports that Adderall was effective in treating ADD; the lack of any psychometric testing of Plaintiff's memory or cognitive functioning; the largely normal clinical observations and mental status exams of treating sources Dr. Kidder and treaters at Bowen Center, including no observations of significant deficits in concentration or attention; Plaintiff's frequent denial of depression and anxiety in Dr. Kidder's treatment notes; the findings of Dr. Boen that Plaintiff's concentration and short-term memory were only moderately below normal; the lack of any diagnosis for a cognitive disorder; the reported effectiveness of Plaintiff's medications in clearing her mind and lessening her anxiety and depression; and Plaintiff's reported difficulty in completing multi-step tasks (Tr. 1054-55).

The ALJ referred back to this analysis in explaining why Dr. Boen's opinions as to Plaintiff's concentration and ability to stay on task were inconsistent with the other record medical evidence (Tr. 1061). In addition, he specifically stated that although Dr. Boen was a mental health specialist, he did not have a longitudinal relationship with Plaintiff, and the observations of Plaintiff's treating sources over time showed that she had much more normal functioning (Tr. 1061). The ALJ again referred to Plaintiff's largely normal mental status exams with Dr. Kidder; Plaintiff's denial of depression or anxiety to him at times; Plaintiff's reports that her medications were effective; and her improved symptoms of mood and anxiety

20

from her initial assessment at Bowen Center (Tr. 1060-61). Finally, the ALJ found that the record did not support the extent of concentration problems alleged by Plaintiff and that to the extent that the limitations in Dr. Boen's opinion were suggested by Plaintiff's own report of symptoms to him, rather than by the normal to moderate results including his own exam findings, his opinion was not well-supported (Tr. 1061). *See, e.g., Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (opinions on which ALJ should rely need to be based on independent observations). These were all reasonable bases to reject Dr. Boen's opinions. *See* 20 C.F.R. § 404.1527(d) (listing consistency and supportability as factors); *see also Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009) ("An ALJ is entitled to evaluate the evidence and explanations that support a medical source's findings.").

Plaintiff does not discuss any reasons that the ALJ gave for discounting Dr. Boen's opinions, but only wrongly suggests that the ALJ erred in rejecting the opinions because Dr. Boen was the Agency's own consulting examiner (Brf. at 10). She also vaguely contends that her oncologist's "anticipation of widespread toxicity across body systems from chemotherapy dovetails concretely in with Dr. Boen's opinion, which is also not contested" (Brf. at 10). Plaintiff does not elaborate on this broad claim that fails to acknowledge any of the reasons the ALJ gave for discounting Dr. Boen's opinions (Brf. at 10). Plaintiff may disagree, but that does not mean that the ALJ did not reasonably articulate and support his finding (Tr. 1060-61; Brf. at 9-10).

Finally, Plaintiff suggests that the ALJ erred in finding that she had the concentration to remember and perform simple tasks and did not provide sufficient reasoning for proper judicial review (Brf. at 9). However, Plaintiff ignores that the ALJ provided a litany of additional

mental restrictions that included low-stress work; predictable changes in environment; flexible, goal-oriented pace; and superficial interaction with others (Tr. 1059-61). She also ignores that the ALJ provided detailed rationale for why he imposed them, including Plaintiff's and her partner's own statements; treatment history; effective medications; clinical observations and normal mental status exams; and "fleshing out" the RFC opinions of state agency reviewing psychologists, who opined that Plaintiff would likely benefit from avoiding high-stress situations and avoiding working in crowded environments (Tr. 94, 117, 121-22, 1054-55, 1059-61). For these reasons, Plaintiff's contentions are unavailing.

Although Plaintiff argues that the ALJ did not properly weigh Dr. Kidder's opinion, it is clear that the ALJ properly rejected Dr. Kidder's opinion that due to the combined effects of impairments he listed, Plaintiff was not able to work (Tr. 1058). After acknowledging that Dr. Kidder was a treating physician but not a specialist, the ALJ reasonably rejected the opinion, in accordance with the regulations (Tr. 1058). First, the ALJ found that it was not a medical opinion that would ever be entitled to controlling weight, as the ultimate determination of disability is a question reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2); SSR 96-5p. Second, an ALJ must give controlling weight to a treating physician's opinion only if it is both well-supported by medically acceptable diagnostic techniques and not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(d); SSR 96-2p; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The ALJ found that Dr. Kidder's conclusory opinion, which the ALJ noted simply listed diagnoses, lacked supportability because Dr. Kidder did not cite to medical evidence or specific limitations of function (Tr. 1058). This finding was reasonable under the regulations. *See* 20 C.F.R. § 416.927(d)(3); *Simila v. Astrue*, 573 F.3d 503, 516 (7th

Cir. 2009) ("An ALJ is entitled to evaluate the evidence and explanations that support a medical source's findings."). In addition, a claimant must do more to establish a disabling impairment than merely show its presence. *See, e.g., Schmidt*, 395 F.3d at 745-46 (argument that a diagnosis meant that the claimant experienced disabling symptoms deemed an unfounded leap in logic); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) (diagnosis alone not disabling).

Third, the ALJ found that the record medical evidence, including the findings of orthopedists at Ortho Northeast, consultative exam findings from Dr. Ringel, the opinions of state agency reviewing physicians Dr. Eskonen and Dr. Corcoran, and Dr. Kidder's own clinical findings showing largely normal findings, did not support his opined symptom severity -- a finding that the regulations also entitled him to make (Tr. 1058). *See* 20 C.F.R. § 404.1527(d)(3) (listing supportability and consistency as factors in weighing a treating opinion).

Plaintiff argues that the ALJ picked out isolated records from Dr. Kidder and that Dr. Kidder's records needed to be considered in combination (Brf. at 11). However, Plaintiff fails to point to any evidence to support her broad claim. It was her burden to prove disability and simply making an undeveloped argument that the ALJ did not consider Plaintiff's impairments in combination when weighing Dr. Kidder's opinion is meritless. The ALJ considered the record medical evidence at length, including Dr. Kidder's treatment notes, and his notes demonstrate largely normal findings. Plaintiff suggests that these normal findings simply consisted of "default boilerplate," and that it was "irrational" for the ALJ to "insist" repeatedly that this so-called boilerplate be "read as the result of a full psychological exam" (Brf. at 12). However, Plaintiff's hyperbolic claim overstates the ALJ's findings (Brf. at 12; Tr. 1057-58). And Plaintiff ignores that Dr. Kidder's notes reflect that he provided Plaintiff's subjective report of symptoms and

examined Plaintiff, including several mental status exams, at each appointment. Plaintiff's claim that Dr. Kidder's findings were merely boilerplate is, therefore, unsupported (Brf. at 12).

Plaintiff refers to the fact that Dr. Kidder treated her during her pregnancy several years earlier as evidence that overall, he was "best equipped to understand her combined physical impairments including the mental ones that might be, say, heightened by the physical ones" (Brf. at 12). But she cites no evidence for this conjecture, as was her burden to do (Brf. at 12). Conversely, the ALJ's analysis of Dr. Kidder's conclusory opinion actually considered the relevant factors under the regulations, and he cited substantial evidence in support of his findings (Tr. 1057-58). If Plaintiff is arguing that the length of the relationship was a factor that should confer controlling status on Dr. Kidder's opinion, length is just one factor under the regulations. See 20 C.F.R. § 404.1527(d)(3). And the ALJ considered that Dr. Kidder was a treating primary care physician, but also considered that he was not a specialist, and that his opinion lacked supportability and consistency with the other record medical evidence -- all of which are likewise factors under the regulations. See 20 C.F.R. § 404.1527(d)(3) (listing specialty, supportability, and consistency as factors in weighing a treating source's opinion).

Plaintiff acknowledges that it was proper for the ALJ to point out that Dr. Kidder was not a specialist, but she chastises the ALJ, without explanation or elaboration, for allegedly attempting "to cite Dr. Kidder as the premier mental health specialist on the record a full 16 times" (Brf. at 11-12). It is unclear what Plaintiff means by this, again, hyperbolic and undeveloped claim (Brf. at 11-12). There is no inconsistency in the ALJ acknowledging that Dr. Kidder managed Plaintiff's psychotropic medications and performed and reported normal mental status exam findings, while at the same time noting that Dr. Kidder was not a specialist in

mental health or otherwise (Tr.1057-61). In sum, Plaintiff ignores much of the substantial evidence that the ALJ cited in support of his findings, and she cites very little evidence in support of her undeveloped, unsupported series of suppositions (Tr. 1057-58; Brf. at 11-12).

Next, Plaintiff claims that the ALJ erred in considering an amalgam of alleged "opinions" provided by Dr. Armstrong, a primary care doctor, and Dr. Gize, Plaintiff's oncologist, both of whom stopped treating her well before her alleged onset date of June 2012 (Brf. at 13). Plaintiff does not even state what these doctors' alleged "opinions" were (Brf. at 13). Plaintiff claims that Dr. Armstrong opined as to the seriousness of her varicose veins (Brf. at 13). However, the record actually shows that in November 2008, Dr. Armstrong treated Plaintiff for a painful varicose vein in her left leg and pain and swelling in her legs, which Plaintiff herself reported was worse with walking and standing for a long time (Tr. 599-600). Dr. Armstrong simply instructed Plaintiff to wear TED hose as needed (Tr. 600). Similarly, Plaintiff cites, as Dr. Armstrong's opinion, her own subjective report from August 2009 that she had numbness from her hip to her knee if she sat too long and swelling if she walked too long, for which she used ice (Tr. 613-14). Finally, Plaintiff does not explain how any of this evidence contradicts the ALJ's finding or supports a finding of disability, as was her burden. (Brf. at 13). *See* 20 C.F.R. § 404.1512(a); 20 C.F.R. § 404.1520(a)(4)(i)-(iv) (noting that the claimant bears the burden of production at Steps One through Four); *see also Sims*, 309 F.3d at 429 (finding that none of the evidence that the ALJ allegedly ignored established disability).

Next, Plaintiff claims that the ALJ did not articulate and support his RFC finding. Plaintiff claims that the ALJ did not consider her impairments in combination (Brf. at 11). But she essentially reiterates her unsuccessful argument that the ALJ erred in rejecting Dr.

Kidder's opinion that Plaintiff was disabled due to a combination of impairments (Brf. at 11). Moreover, at the outset (Tr. 1057), the ALJ made clear that he considered the combined effects of Plaintiff's impairments, in accordance with SSR 96-8p (Tr. 1057-61). See SSR 96-8p, 1996 WL 374184 at *7 (July 2, 1996) (essentially requiring a narrative discussion of the record evidence and an explanation as to how the evidence supports the ALJ's RFC findings). Plaintiff suggests that the ALJ erred in not accounting for her overactive bladder in his RFC finding (Brf. at 11). However, Plaintiff ignores the sufficient reasons the ALJ gave for finding it not severe, citing minimal evidence and treatment (Brf. at 11; Tr. 1050; *see also* Tr. 343, 862-63, 883-88, 1550, 1580, 1685, 1702). Rather, Plaintiff claims that this was error because the first ALJ found her overactive bladder to be a severe impairment, but the ALJ was not bound by the first decision and reviewed the evidence de novo on remand (Tr. 1050).

Finally, Plaintiff suggests that there were "inherent contradictions" in the ALJ's RFC providing that she could use a cane with other limitations, such as occasionally climbing ramps and stairs (Brf. at 12). However, Plaintiff's counsel before the ALJ is the same counsel making this argument, and he did not challenge the VE's testimony on this point. *See Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (VE "free to give a bottom line," but data and reasoning underlying bottom line must be given if claimant challenges foundation of VE's testimony). In addition, at least three of the representative jobs require no climbing at all (See Tr. 1062) (listing jobs and DOT numbers). Plaintiff's arguments fail.

As part of his RFC determination, the ALJ reasonably supported and articulated his assessment of Plaintiff's subjective symptoms, in accordance with SSR 96-7p and the regulations (Tr. 1057-61).4 The ALJ considered a host of factors, including Plaintiff's subjective

statements; her activities of daily living; the results of diagnostic exams; objective medical images; largely normal mental status exams; Plaintiff's treatment history for both her mental and physical impairments; the statements of her partner; and the record medical opinions, among other things (Tr. 1057-61). *See* 20 C.F.R. § 404.1529; SSR 96-7p.

Plaintiff raises three unavailing arguments that appear to be related to the ALJ's subjective symptom assessment (Brf. at 10). First, she suggests that the ALJ erred in considering whether her cane was prescribed (Brf. at 10). This argument makes no sense, as the ALJ's RFC finding specifically provided that Plaintiff required a cane for prolonged walking and walking on uneven surfaces (Tr. 1056, 1058-59). Thus, Plaintiff has not shown how the ALJ erred in merely mentioning that a cane was prescribed at her request (Tr. 1034, 1058-59).

Second, Plaintiff claims that the ALJ erred in considering her activities of daily living (Brf. at 10). But the ALJ considered Plaintiff's activities at length, including the qualified manner in which she performed some of them and the breaks she took (Tr. 1051-52, 1057). Plaintiff argues that with respect to Plaintiff's activities of daily living, the ALJ erred in finding that she has not shown that she cannot live outside a highly supportive living arrangement (Brf. at 10). But a simple reading of the ALJ's decision shows that he did not make this finding in relation to Plaintiff's daily activities (Tr. 1055). Rather, the ALJ made this finding in determining that Plaintiff did not satisfy the "C" criteria under the mental health Listings (Tr. 1055). The mental health listings at issue here required Plaintiff to satisfy the requirements in both paragraphs "A" and "B" of the listing or those in paragraph "C" of the listing. 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.04, 12.06. To meet the requisite level of severity under paragraph C, it was Plaintiff's burden to show:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id*. The ALJ found that none of the requirements in paragraph C were satisfied because, among other things, the record contained no evidence that Plaintiff required a highly supportive living arrangement (Tr. 1055). Thus, Plaintiff's argument is misplaced.

Finally, Plaintiff suggests that her work history ought to underscore her credibility (Brf. at 10). Here, at the outset, the ALJ specifically cited Plaintiff's good work history and her reporting self-employment earnings as a babysitter as a positive factor in his subjective symptom assessment (Tr. 1057). At Step Three, the ALJ found that there was nothing in the record to support Plaintiff's assertion that other employees helped her with her job duties after she resumed work following her chemotherapy treatments (Tr. 1053). If Plaintiff is referring to this finding, it was not in the ALJ's subjective symptom assessment and, in any event, she presents no evidence showing that she performed accommodated work, as she seems to suggest (Brf. at 10). Plaintiff's vague argument, offering no references to the ALJ's decision or the record, thus fails.

This court finds that Plaintiff's arguments are meritless, and that substantial evidence supports the ALJ's decision.

<u>Conclusion</u>

On the basis of the foregoing, the ALJ's decision is hereby AFFIRMED.


Enter: May 19, 2017.




<u>s/ William C.  Lee</u>
William C. Lee, Judge
United States District Court